# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
EDITH ANN HIGGINS,                               )
                                                 )
      Plaintiff,                           )
                                                 )
    v.                                       )     Civil Action No. 16-27 (RBW)
                                                 )
ANDREW SAUL, in his official capacity            )
as Commissioner of the Social Security           )
Administration,[1]                               )
                                                 )
      Defendant.                           )
———————————————————————)

## MEMORANDUM OPINION

     The plaintiff, Edith Ann Higgins, brings this civil action against the defendant, Andrew

Saul, in his official capacity as Commissioner of the Social Security Administration ("SSA") (the

"Commissioner"), challenging the Commissioner's decision denying her claim for disability

insurance benefits pursuant to 42 U.S.C. § 405(g) (2018).  See generally Complaint ("Compl.").

On January 20, 2016, this Court "referred [the case] to a Magistrate Judge for full case

management up to, but excluding, trial[,] . . . includ[ing], with respect to any dispositive motions,

preparation of a report and recommendation."  Order at 1 (Jan. 20, 2016), ECF No. 3.

Thereafter, the plaintiff filed a Motion for Judgment of Reversal ("Pl.'s Mot."), and the

Commissioner filed the Defendant's Motion for Judgment of Affirmance and in Opposition to

Plaintiff's Motion for Judgment of Reversal ("Def.'s Mot.").  On March 3, 2017, the Magistrate

Judge issued a Report and Recommendation recommending that the Court deny the plaintiff's

---

[1] Andrew Saul is the current Commissioner of the Social Security Administration, see Commissioner, Social Security, https://www.ssa.gov/agency/commissioner.html (last visited Aug. 12, 2019), and the Court therefore substitutes him for former Acting Commissioner Nancy A. Berryhill as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d).

motion and grant the defendant's motion. See Report and Recommendation (the "Report" or "R & R") at 1. Currently before the Court are the Plaintiff's Objections to the Report and Recommendation of the Magistrate Judge ("Pl.'s Objs."). Upon careful consideration of the parties' submissions,[2] the Court concludes that it must grant in part and deny in part the plaintiff's motion for a judgment of reversal and deny the defendant's motion for a judgment of affirmance.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

The Social Security Act provides disability insurance benefits and supplemental security income to qualifying individuals with a disability. See 42 U.S.C. §§ 423(a)(1), 1381, 1381a. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." Id. § 423(d)(1)(A). "With certain exceptions not relevant here, an individual is disabled 'only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Butler v. Barnhart, 353 F.3d 992, 997 (D.C. Cir. 2004) (alterations in original) (quoting 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(B)).

---

[2] In addition to the documents already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment of Reversal ("Pl.'s Mem."); (2) the Defendant's Memorandum in Support of Her Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal ("Def.'s Mem."); (3) the Plaintiff's Response to Motion for Judgment of Affirmance and Reply to Motion for Judgment of Reversal ("Pl.'s Resp."); (4) the Defendant's Response to Plaintiff's Objections to the Magistrate Judge's Report and Recommendation ("Def.'s Resp."); and (5) the Plaintiff's Reply to Defendant's Response to Plaintiff's Objections to the Magistrate's Report and Recommendation ("Pl.'s Reply").

The Commissioner uses a five-step process to determine whether a claimant is disabled, see 20 C.F.R. § 416.920, with "[t]he claimant carr[ying] the burden of proof on the first four steps," Butler, 353 F.3d at 997. At the first step, the claimant must demonstrate that she is not engaged in "substantial gainful activity," 20 C.F.R. § 416.920(a)(4)(i), which is defined as work that "[i]nvolves doing significant and productive physical or mental duties; and [ ] i[s] done (or intended) for pay or profit," id. § 404.1510. At the second step, the claimant must establish that she has a "severe medically determinable physical or mental impairment that meets the [twelve-month] duration requirement." Id. § 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits her physical or mental ability to do basic work activities." Id. § 416.920(c). At the third step, if the claimant can establish that her "impairment(s) [ ] meets the duration requirement" and "meets or equals one of [the] list[ed] [impairments] in appendix 1" of the SSA's regulations, the Commissioner "will find that [she] [is] disabled." Id. § 416.920(a)(4)(iii), (d). If the claimant does not make this showing, the Commissioner's inquiry moves on to the fourth step, which requires the claimant to demonstrate that her impairment prevents her from performing her "past relevant work," id. § 416.920(a)(4)(iv), (e), which is defined as "work that [a claimant] ha[s] done within the past [fifteen] years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it," id. § 404.1560(b)(1). "Once a claimant has carried the burden on the [ ] four[th] step[], the burden shifts to the Commissioner on step five to demonstrate that the claimant is able to perform 'other work.'" Butler, 353 F.3d at 997 (quoting 20 C.F.R. §§ 404.1520(f), 416.920(f)).

To evaluate a claim at steps four and five, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 416.920(e). A claimant's residual

functional capacity "is the most [the claimant] can do despite [physical and mental] limitations" resulting from her "impairment(s)[] and any related symptoms." Id. § 416.945(a)(1). The "[residual functional capacity] assessment must [ ] identify the [claimant]'s functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). Specifically, the residual functional capacity assessment "must address both the remaining exertional and nonexertional capacities of the individual." Id. at *5. "Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: [s]itting, standing, walking, lifting carrying, pushing, and pulling." Id. "Nonexertional capacity considers an individual's ability to perform the following work-related functions: postural activities like stooping and climbing; manipulative activities like reaching and handling; visual activities; communicative activities; and mental activities." Davis v. Berryhill, 272 F. Supp. 3d 154, 171 (D.D.C. 2017) (citing SSR 96–8p, 1996 WL 374184, at *6).

"The [SSA] regulations describe a two-step process for evaluating symptoms[.]" SSR 96–7p, 1996 WL 374186, at *2. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)[] . . . that could reasonably be expected to produce the individual's pain or other symptoms." Id. "Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. "In evaluating the intensity and persistence of [a claimant's] symptoms, . . . [the Commissioner] consider[s] all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the] symptoms affect [the claimant]," and "determine[s] the extent to which [the] alleged

functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence." 20 C.F.R. § 404.1529(a). Statements about how the symptoms affect the claimant may include opinions "from acceptable medical sources," id. § 404.1527(a)(1); "[o]pinions from medical sources who are not acceptable medical sources and from nonmedical sources," id. § 404.1527(f)(1); and statements from the claimant herself or other individuals, see id. § 404.1529(c)(4). Acceptable medical sources include "treating sources," such as the claimant's own physician who has "provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]," id. § 404.1527(a)(2); nontreating sources, such as a physician who has examined the claimant "but does not have . . . an ongoing treatment relationship with [the claimant]," id. § 404.1527(a)(2); or "nonexamining source[s]," id. § 404.1527(c)(3), meaning physicians "who ha[ve] not examined [the claimant] but provide[] a medical or other opinion," 20 C.F.R. § 404.1502 (2012). At the time the plaintiff in this case applied for benefits, nonacceptable medical sources included "nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists." 20 C.F.R. § 404.1513(d)(1) (2012).[3] If the claimant requests a hearing, the Commissioner may also consider assessments regarding the claimant's residual functional capacity "made by . . . State agency medical . . . consultants . . . based on their review of the evidence in the case record." Id. § 404.1513(a)(5).

"[W]henever [an] individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [Commissioner] must make a finding on the credibility of the individual's statements based

---

[3] Since the plaintiff in this case applied for benefits, "the [SSA] regulations have been amended and for claims filed after March 27, 2017, a 'Licensed Advance Practice Registered Nurse, or other licensed advanced practice nurse with another title' may be considered an 'acceptable medical source.'" Troy v. Colvin, 266 F. Supp. 3d 288, 295 (D.D.C. 2017) (quoting 20 C.F.R. §§ 404.1502(a), 416.902(a)).

on consideration of the entire case record." SSR 96–7p, 1996 WL 374186, at *2. "The reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision." Id. For example,

> [i]t is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible[.]' . . . The determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [Commissioner] gave to the [ ] statements and the reasons for that weight."

Id.

"The administrative review process consists of several steps." 20 C.F.R. § 404.900(a). First, the Commissioner makes an "[i]nitial determination" on a claimant's application. Id. § 404.900(a)(1). Second, "[i]f [a claimant] [is] dissatisfied with an initial determination, [she] may ask [the Commissioner] to reconsider it," id. § 404.900(a)(2), and third, "[i]f [a claimant] [is] dissatisfied with the reconsideration determination, [she] may request a hearing before an administrative law judge" ("ALJ"), id. § 404.900(a)(3). Finally, "[i]f [a claimant] [is] dissatisfied with the decision of the [ALJ], [she] may request that the Appeals Council review the decision." Id. § 404.900(a)(4). Once these four steps are completed, the Commissioner "ha[s] made [his] final decision." Id. § 404.900(a)(5). "Any individual, after [a] final decision [by] the Commissioner[,] . . . may obtain review of such decision by a civil action commenced within sixty days after the mailing . . . of notice of such decision[,] . . . [and] [s]uch action may be brought in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court may affirm, modify, or reverse the decision of the Commissioner with or without remanding it for a rehearing. See id.

**B.      Factual Background and Procedural History**

The plaintiff filed her application for disability benefits on June 28, 2012.  <u>See</u>

Administrative Record ("AR") 18.  In her application, she "alleg[ed] disability beginning April

30, 2012," AR 18, based on "chronic pulmonary restrictive disease, sleep apnea, and diabetes,"

<u>see</u> AR 61.

In support of her application, the plaintiff completed and submitted a "Function Report"

and a "Work History Report."  <u>See</u> AR 184–205.  In the Work History Report, the plaintiff

reported that, in the past fifteen years, she had held positions as a pharmacy technician at a clinic

and a retail business, a customer service representative at a call center and a utility business, and

a quality assurance agent at a call center.  <u>See</u> AR 187.  In the plaintiff's Function Report, which

is a questionnaire regarding "[h]ow [her] . . . conditions limit[ed] [her] activities," the plaintiff

reported that she "ha[d] periods when [she] c[ould not] concentrate," "g[ot] out of breath

quickly," "sometimes ha[d] a hard time breathing," AR 198, and was "unable to stay awake for

long periods of time," AR 199.   She also reported that she "often t[ook] longer to complete tasks

because [she was] tired [and] sleepy" and could pay attention only for "about [thirty] minutes."

AR 203.  As to her daily activities, the plaintiff reported that she "[d]ress[ed] [her] minor child,

d[id] household chores, [and] cook[ed][,] taking frequent breaks between every task."  AR 199.

Additionally, she reported that she prepared "[c]omplete meals" three to four times per week, AR

200, went outside two to three times per week, <u>see</u> AR 201, "read[], watch[ed] [television, and

used the] computer" daily, "[s]p[oke] with people on the phone and computer" four to five times

per week, and went to church weekly, AR 202.  She also indicated that she was able to pay bills,

count change, handle a savings account, and use a checkbook and money orders.  <u>See</u> AR 201.

The plaintiff's adult daughter, Lula Barnes, also completed a Function Report regarding the plaintiff's limitations. See AR 209–16. Barnes reported that the plaintiff "[wa]s unable to concentrate for long periods of time, [ ] los[t] her train of thought often," AR 209, and "ha[d] trouble completing task[s] because she falls asleep," AR 214. Barnes also reported that the plaintiff did "everything necessary" for her minor child, who at the time was almost two years old, AR 210, prepared "[c]omplete meals" weekly, AR 211, did "[c]leaning and laundry" daily "with frequent breaks," AR 211, and "read[], wr[ote], play[ed] cards, play[ed] computer games, [and] watch[ed] [television]" daily but was "prone to failing asleep while doing" those activities, AR 213.

To evaluate the plaintiff's claim, the SSA obtained various medical records documenting the plaintiff's medical history. Specifically, it obtained progress notes from Laura Worby, a certified nurse practitioner ("Nurse Worby"), recording Nurse Worby's treatment of the plaintiff from January 2011 to June 2012. See AR 365–461. The records reflect Nurse Worby's findings that the plaintiff had the following conditions: type II diabetes, hypertension, morbid obesity, emphysema, a personal history of tobacco use, and postablative hypothyroidism. See AR 366. Nurse Worby's records also reflect that she treated these conditions by, inter alia, prescribing various medications, see, e.g., AR 366–67, advising the plaintiff on her diet, see, e.g., AR 373 (reporting that she "encouraged [the plaintiff] to . . . monitor diet[] [and] to limit soda intake"), and "counsel[ing] [the plaintiff] on the dangers of tobacco use and urg[ing] [her] to quit" smoking cigarettes, AR 367. Additionally, Nurse Worby's records reflect that the plaintiff was hospitalized at the Washington Hospital Center from January 30 to February 2, 2012, due to "emph[y]s[e]ma exacerbation, pneumonia, [and] heart failure" and was "discharged on [two] liters of continuous [oxygen]." AR 378.

On August 17, 2012, the SSA obtained a medical opinion from Dr. Earl Nicholas, a state agency consultant. See AR 77. Dr. Nicholas's report acknowledges receipt of the plaintiff's and Barnes's Function Reports, the plaintiff's Work History Report, and the pre-June 2012 medical records. See AR 71–72. Dr. Nicholas's report makes various factual findings regarding the plaintiff's medical history and concluded that the plaintiff has exertional, postural, and environmental limitations. See AR 74–75. As to the plaintiff's exertional abilities, Dr. Nicholas found that the plaintiff could frequently lift or carry less than ten pounds, stand or walk with normal breaks for a total of two hours in an eight-hour workday, sit with normal breaks for a total of six hours in an eight-hour workday, and push or pull with no limits. See AR 74. As to the plaintiff's postural abilities, he concluded that the plaintiff could frequently balance and stoop and occasionally climb ramps or stairs, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. See AR 74. Finally, as to the plaintiff's environmental abilities, Dr. Nicholas concluded that the plaintiff could be exposed to extreme cold, wetness, and noise on an unlimited basis, but must "[a]void even moderate exposure" to extreme heat, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. AR 75. Ultimately, however, Dr. Nicholas concluded that the plaintiff's "limitations d[id] not prevent [her] from performing work [she] ha[d] done in the past as a customer service representative." AR 77. Accordingly, he concluded that the plaintiff was not disabled. See AR 77. [4]

The Commissioner rendered an initial decision denying the plaintiff's claim on August 20, 2012. See AR 18. Thereafter, the plaintiff sought reconsideration of the Commissioner's

---

[4] The Court notes that the record contains another opinion from Dr. Nicholas, which is signed by him on the same date as the opinion cited above and contains the same findings regarding the plaintiff's limitations but concludes that the plaintiff cannot perform her past work and is disabled. See AR 61–68. Because the ALJ did not consider this alternative opinion, see AR 23 (citing AR 74–75), and because neither the plaintiff nor the defendant asserts that the ALJ should have considered it or that the opinion undermines the ALJ's conclusion, the Court need not consider it in evaluating the plaintiff's objections to the Magistrate Judge's Report.

decision. See AR 92. In response, the SSA obtained a second medical opinion from Dr.

Jacqueline McMorris, another state agency consultant. See AR 78–86. In addition to the

materials received by Dr. Nicholas, Dr. McMorris received various medical records that the SSA

obtained from the Washington Hospital Center in August and December 2012. See AR 79. Dr.

McMorris affirmed Dr. Nicholas's findings as to the plaintiff's abilities, see AR 82–83, as well

as his conclusion that the plaintiff's limitations did not prevent her from performing her past

work as a customer service representative, see AR 85. Accordingly, Dr. McMorris also

concluded that the plaintiff was not disabled. See AR 85. Upon reconsideration of his initial

decision denying the plaintiff's claim, taking into account the second opinion from Dr.

McMorris, the Commissioner again denied the plaintiff's claim on January 11, 2013. See AR

18. Then, on February 13, 2013, the plaintiff filed a written request for a hearing, which the

Commissioner granted. See AR 18.

 Prior to her administrative hearing, the plaintiff submitted additional evidence, including

a "Sleep Disorders Residual Functional Capacity Questionnaire" completed by Nurse Worby on

March 7, 2014. AR 539, 542. Nurse Worby reported on the questionnaire that the plaintiff

experienced "daytime sleep attacks" that typically occurred four to five times per day and lasted

forty-five minutes each time, AR 539, as well as "side effects of medications" in the form of

"[d]rowsiness/sedation," AR 540. Nurse Worby also found that the plaintiff's "[d]iabetic

neuropathy interfere[d] with standing." AR 542. Due to these issues, Nurse Worby concluded

that the plaintiff would likely need to take four unscheduled breaks to rest during an average

workday, with each break lasting an average of forty-five minutes. See AR 541. Nurse Worby

also concluded that the plaintiff could sit continuously for only thirty minutes at a time and for

less than a total of two hours in an eight-hour workday with normal breaks, and stand

continuously for only twenty minutes at a time and for less than two hours in an eight-hour work day with normal breaks. See AR 540.

On April 23, 2014, an ALJ conducted a hearing on the plaintiff's claim, which included testimony from the plaintiff and an impartial vocational expert. See AR 18. As to her symptoms, the plaintiff testified, inter alia, that she "was falling asleep . . . more often, even though [she was] using [her] [continuous positive airway pressure ('CPAP')] machine at night," and that, in January 2013, she "fell asleep in the middle of [ ] writing [a grocery] list." AR 53. She further testified that "the only reason . . . [Barnes was] still living at home [with her] [wa]s because . . . [she] f[e]ll asleep so eas[il]y [and she] d[id not] want anything to happen to her" then-three-year-old daughter. AR 43–44. She also testified that she used oxygen "all day every day," AR 38, "[b]ecause if [she] want[ed] to do anything at all [she] ha[d] to have the oxygen on," AR 52. She further testified that she used a travel oxygen tank that weighed "maybe seven pounds," as well as a "stationary" tank that she used at home. AR 52. The plaintiff also testified that she "originally applied [for disability benefits] when [her medical providers] first told [her] that [she] was going to be on [ ] oxygen[,] . . . because that's what everybody said [she] was supposed to do since [she] was [ ] on [ ] oxygen." AR 56.

As to her daily activities, the plaintiff testified that she "g[o]t [her] three-year-old [daughter] ready for school," AR 46, and walked her daughter four blocks to school, see AR 47, "normally . . . stop[ping] a couple of times going up [a] hill," AR 50. She also testified that she was "able to . . . bath[e] [her]self and dress [her]self" but that it was "a slow process," and that she was also able to "wash dishes, . . . wipe off [ ] the furniture[,] and [ ] [i]f [she] t[ook] [her] time[,] . . . sweep the floors," AR 49, and do laundry, so long as there were no detergents or products present that "irritate[d] [her] lungs and [ ] breathing," AR 48. The plaintiff further

11

testified that she would "try to prepare dinner" and "get it started, [but] normally somebody else ha[d] to finish it." AR 47. She additionally testified that she watched television for about two or three hours a day, <u>see</u> AR 54, and played memory games on the computer for "[m]aybe an hour" each day, AR 54, but that she did not read, talk to friends on the telephone, or spend time going out with friends, <u>see</u> AR 55. She also testified that she could lift and carry about fifteen pounds, <u>see</u> AR 48, and sit down comfortably for "[a]bout [ ] half an hour," AR 50.

The vocational expert testified that the plaintiff's past work as a pharmacy technician was "light" and her past work as a customer service representative and quality assurance agent was "sedentary." AR 57. In response to hypothetical questions from the ALJ, the vocational expert opined that if the plaintiff were limited to standing or walking approximately two hours and sitting approximately six hours in an eight-hour workday, she could perform her past sedentary positions, but if she were limited to sitting for two hours in an eight-hour workday, she could not perform any of her past relevant work or any other work. <u>See</u> AR 58–59. In response to questioning from the plaintiff's representative, the vocational expert also testified that, "[i]f [a]n individual is off task for [fifteen] to [eighteen] percent of the workday," the individual could not maintain any work in the national economy. AR 59.

On August 21, 2014, the ALJ issued a decision determining that the plaintiff is not disabled and denied the plaintiff's claim. <u>See</u> AR 25. Following the five-step analysis outlined above, the ALJ concluded at step one that the plaintiff "ha[d] not engaged in substantial gainful activity since April 30, 2012, the alleged onset date" of her disability. AR 20. The ALJ then concluded at step two that the plaintiff "ha[d] the following severe impairments: hypertension, diabetes, COPD, sleep apnea, and obesity," but concluded at step three that none of those impairments, alone or in combination, "me[t] or medially equal[ed] the severity of one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." AR 20. The ALJ then assessed the plaintiff's residual functional capacity and concluded that she

> ha[d] the residual functional capacity to perform sedentary work as defined in 20 C[.]F[.]R[.] [§] 404.1567(a) except lifting up to [ten] pounds occasionally, standing or walking approximately two hours, sitting approximately six hours in an eight[-] hour workday; pushing and pulling are unlimited except as shown for lifting and carrying; never crawling or climbing ladders, ropes, or scaffolds; frequently balancing, occasionally climbing ramps and stairs, stooping, crouching, and kneeling; and . . . avoid[ing] even moderate exposure to extreme heat, humidity, vibration, fumes, odors, dust, gases, poor ventilation, and hazards such as machinery and heights.

AR 21.

In further assessing the plaintiff's residual functional capacity, the ALJ concluded that although the plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms" of "being unable to stay awake, periods when she c[ould not] concentrate, getting out of breath quickly, and sometimes having a hard time breathing," the plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [we]re not entirely credible." AR 21. Specifically, the ALJ concluded that "[s]everal elements in the record call[ed] into question the credibility of the [plaintiff's] allegations," namely, the plaintiff's "testi[mony] that she applied for disability when she began using oxygen, because that is what everyone told her she was supposed to do," that she "ha[d] not been compliant with her treatment," AR 21, and that "her activities of daily living [went] beyond limitations that preclude work," AR 22. With respect to the plaintiff's daily activities, the ALJ observed that the plaintiff

> cares for her children and grandchildren, performs personal care, prepares complete meals several times a week, cleans, and does laundry. She goes outside two to three times a week, walks, uses public transportation, shops in stores and online, handles money, reads, watches television, uses her computer, attends church, and communicates on the telephone and computer four to five times a week.

AR 22.

13

Additionally, the ALJ considered, but did not credit, Barnes's statements "that the [plaintiff] is unable to concentrate for long periods of time, [ ] loses her train of thought, and [that] her ability to stay awake ha[d] been decreasing." AR 23. The ALJ reasoned that the plaintiff's "activities [ ] of preparing complete meals, reading, writing, playing cards and computer games, and watching television all require the ability to maintain concentration for the duration of those activities." AR 24.

As to the medical opinion evidence in the record, the ALJ "g[ave] [Dr. Nicholas's and Dr. McMorris's] opinions great weight, because th[o]se medical doctors reviewed the [plaintiff's] medical records, and they have experience relating impairments to limitations." AR 23. The ALJ also concluded that "the evidence regarding the [plaintiff's] level of functioning is consistent with the[ir] opinions, and the[] opinions are consistent with the evidence at the hearing level." AR 23 (citation omitted). By contrast, she assigned Nurse Worby's opinion "very little weight" for several reasons, including that Nurse Worby "is not an acceptable medical source," "her opinion concerning the claimant's limitations is grossly inconsistent with the evidence of record, including the claimant's acknowledged activities and level of functioning," and her "opinion concerning the extent of limitations on sitting and reported number of sleep attacks are not consistent with either the medical record or any statement regarding the claimant's activities of daily living." AR 24.

Finally, at step four, the ALJ concluded that the plaintiff was "capable of performing [her] past relevant work as a customer service representative and quality assurance agent." AR 24. In reaching this conclusion, the ALJ found that, "[i]n comparing the [plaintiff's] residual functional capacity with the physical and mental demands of this work, . . . the [plaintiff] [wa]s able to perform [the work] as actually and generally performed." AR 25. Additionally, the ALJ

observed that the "work does not require the performance of work-related activities precluded by the [plaintiff's] residual functional capacity." AR 24. Accordingly, the ALJ concluded that the plaintiff was not disabled. See AR 25.

On August 21, 2014, the plaintiff requested that the Appeals Council review the ALJ's decision; however, the Appeals Council "denied [her] request for review" on November 10, 2015. AR 1. The plaintiff then filed the instant case on January 7, 2016. See Compl. at 1. On January 20, 2016, this Court referred the plaintiff's case to a Magistrate Judge for full case management. See Order at 1 (Jan. 20, 2016), ECF No. 3. Thereafter, the plaintiff filed her motion for judgment of reversal, see Pl.'s Mot. at 1, and the defendant filed his motion for judgment of affirmance, see Def.'s Mot. at 1.

On March 3, 2017, the Magistrate Judge issued her Report assessing the parties' motions. See R & R at 1. In her Report, the Magistrate Judge found that "[t]he ALJ's [residual functional capacity] determination was supported by substantial evidence," id. at 6, because, inter alia, "there was no significant evidentiary gap in the administrative record" and the ALJ "properly evaluated and discredited [the] [p]laintiff's allegations of daytime 'sleep attacks' and her need for oxygen," id. at 11. Accordingly, the Magistrate Judge recommended that this Court deny the plaintiff's motion and grant the defendant's motion. See id. at 12. On April 15, 2017, the plaintiff filed her objections to the Magistrate Judge's Report, see Pl.'s Objs. at 1, which are the subject of this Memorandum Opinion.

## II. STANDARDS OF REVIEW

### A. Objections to Report and Recommendation

Federal Rule of Civil Procedure 72(b) governs the Court's resolution of objections to a magistrate judge's report and recommendation on dispositive motions. The Rule provides that

the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The [Court] may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). In their objections, the parties may not present new issues or arguments to the Court; rather, "only those issues that the parties have raised in their objections to the Magistrate Judge's report will be reviewed by this [C]ourt. . . . Furthermore, objecting to only certain portions of the Magistrate Judge's report 'does not preserve all the objections one may have.'" Aikens v. Shalala, 956 F. Supp. 14, 19–20 (D.D.C. 1997) (citations omitted). And, "when a party makes conclusory or general objections, or simply reiterates his original arguments, the Court reviews the [r]eport and [r]ecommendation only for clear error." M.O. v. District of Columbia, 20 F. Supp. 3d 31, 37 (D.D.C. 2013) (Walton, J.) (citation and internal quotation marks omitted).

**B.      The Commissioner's Disability Determination**

Under 42 U.S.C. § 405(g), a court reviewing a benefits determination by the Commissioner is "confined to determining whether the [Commissioner's] decision . . . [was] supported by substantial evidence in the record." Brown v. Bowen, 794 F.2d 703, 705 (D.C. Cir. 1986). "Substantial-evidence review is highly deferential to the agency fact-finder." Rossello ex rel. Rossello v. Astrue, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (citation omitted). With respect to the Commissioner's factual determinations, the "substantial evidence" requirement mandates that the Commissioner's findings be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted). The standard requires "more than a scintilla, but less than a preponderance of the evidence." Evans Fin. Corp. v. Dir., Office of

Workers' Comp. Programs, 161 F.3d 30, 34 (D.C. Cir. 1998) (citation and internal quotation marks omitted). With respect to the Commissioner's legal rulings, the reviewing court must uphold the Commissioner's legal "determination if it . . . is not tainted by an error of law." Smith v. Bowen, 826 F.2d 1120, 1121 (D.C. Cir. 1987). The "[C]ourt shall review only the question of conformity" by the Commissioner to the SSA's regulations as well as "the validity of such regulations." 42 U.S.C. § 405(g). The Court's review "'calls for careful scrutiny of the entire record' to determine whether the [Commissioner], acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits.'" Simms v. Sullivan, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (citations omitted). However, the Court may only consider the grounds proffered by the agency in its decision, as post hoc rationalizations by an agency will not suffice. See Butler, 353 F.3d at 1003 n.5. And, the Court "may not reweigh the evidence presented to it[,] . . . [or] replace the [Commissioner's] judgment concerning the weight and validity of the evidence with its own." Turner v. Colvin, 964 F. Supp. 2d 21, 28 (D.D.C. 2013) (alterations in original) (quoting Davis v. Heckler, 566 F. Supp. 1193, 1195 (D.D.C. 1983)).

## III.    ANALYSIS

The plaintiff raises three objections to the ALJ's decision and the Magistrate Judge's Report. First, she argues that the ALJ inadequately considered the plaintiff's medical evidence submitted after June 2012 (the "post-June 2012 medical evidence") by "us[ing] h[er] own lay judgment" to assess that evidence. See Pl.'s Objs. at 4 (citation omitted). Second, she argues that "the ALJ failed to perform a function by function analysis of the frequency and duration of [the plaintiff's] sleep attacks and her need for daytime oxygen." Id. at 8. Third, she argues that "the ALJ erred by relying on [ ] stale non-examining medical opinions from [ ] physician[s] who

had only a small fraction of her medical records to [ ] review," id. at 4 (citation omitted),

referring to the opinions of state agency consultants Dr. Nicholas and Dr. McMorris.  The Court

will address each argument in turn.

## A.    The ALJ's "Lay Judgment" Analysis of the Post-June 2012 Medical Evidence

The plaintiff argues that the ALJ erred by "us[ing] h[er] own lay judgment to" evaluate

the post-June 2012 medical evidence, id. at 4 (citation omitted), because an ALJ cannot "review

raw medical data without the assistance of any medical expert," id. at 5; see Pl.'s Mem. at 24

(arguing that the ALJ had "an affirmative obligation to obtain medical opinion evidence

regarding" the post-June 2012 medical evidence).  The defendant responds that "the ALJ's duty

to obtain an updated medical opinion was not triggered in this case because the ALJ had all the

information necessary to make a disability determination and the ALJ did not find that [Nurse]

Worby's [post-June 2012] treatment notes would change the state agency doctors' findings."

Def.'s Resp. at 2 (citations omitted).

The Court must reject the plaintiff's argument that the ALJ improperly considered the

post-June 2012 medical evidence by evaluating it herself rather than obtaining a medical opinion

regarding it.  The SSA's regulations expressly require ALJs to evaluate "all the relevant medical

and other evidence" in making their residual functional capacity assessment, 20 C.F.R.

§ 416.920(e), "including [a claimant's] medical history[] [and] the medical signs and laboratory

findings," id. § 404.1529(a).  The plaintiff does not identify, nor is the Court able to locate, any

regulation requiring that an ALJ obtain a medical opinion regarding such evidence.  See

Goodman v. Colvin, 233 F. Supp. 3d 88, 105–06 (D.D.C. 2017) ("[T]here is 'no requirement that

an ALJ must always receive an updated report from the State medical experts whenever new

medical evidence is available.'" (quoting Wilson v. Astrue, 331 F. App'x 917, 919 (3d Cir.

2009))).  Rather, the regulations provide only that certain "[s]ituations [ ] may require [an ALJ to obtain] a consultative examination," 20 C.F.R. § 404.1519a(b) (emphasis added), specifically, "to resolve an inconsistency in the evidence[] or when the evidence as a whole is insufficient to allow . . . a determination or decision on [the plaintiff's] claim," id.; see id. (explaining that "needed medical evidence" may include "clinical findings, laboratory tests, a diagnosis, or prognosis"), and the plaintiff has not made a specific showing that such circumstances are present in this case, see Pl.'s Objs. at 5 (asserting only that, as a general matter, "non-doctors [cannot] review raw medical data without the assistance of any medical expert"); see also Turner v. Astrue, 710 F. Supp. 2d 95, 108 (D.D.C. 2010) (rejecting the plaintiff's argument that the ALJ "failed to adequately develop the administrative record" by not obtaining additional medical opinion evidence because the plaintiff did "not argue that there [we]re any missing records or other relevant evidence that was not presented to the ALJ" and did not object to the record in the administrative proceedings); cf. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (concluding that an ALJ should have obtained "professional assistance" because evaluation of a claimant's psychological impairments "was impossible without first obtaining [and interpreting] the results of three standardized psychological tests").  Thus, the Court cannot conclude that the ALJ's evaluation of the post-June 2012 medical evidence was improper simply because the ALJ did not obtain a medical opinion evaluating that evidence.

The plaintiff cites various decisions for the proposition that "the 'substantial evidence' standard . . . requires that the ALJ's [residual functional capacity] . . . be based more or less on some compelling piece of medical opinion evidence."  Pl.'s Objs. at 5; see citing Pl.'s Mem. at 21–23 (collecting cases).  However, these cases do not establish such a broad proposition. Rather, several of the cases cited conclude that medical opinion evidence is required only in

specific circumstances not demonstrated by the plaintiff here, such as to clarify the content of a "remarkably vague" medical opinion. See, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013). And, to the extent that these opinions suggest that a medical opinion is always required to relate "medical findings in the record . . . to specific residual functional capabilities," Rosado v. Sec'y of Health & Human Servs., 807 F.2d 292, 293 (1st Cir. 1986), none of these decisions is controlling authority, and, as the plaintiff acknowledges, "there is significant disagreement" among courts on whether and when medical opinions are required, Pl.'s Mem. at 24; see, e.g., Felton-Miller v. Astrue, 459 F. App'x 226, 230–31 (4th Cir. 2011) (medical opinion evidence never required).

Thus, because the regulations do not expressly require an ALJ always to obtain a medical opinion, and because the plaintiff has not made a specific showing that the post-June 2012 medical evidence required an opinion by a medical source, the Court cannot conclude that the ALJ erred simply by failing to obtain a medical opinion regarding the post-June 2012 medical evidence.

## B.     The ALJ's Function-by-Function Analysis

The plaintiff next argues that the ALJ erred by "fail[ing] to perform a function by function analysis of the frequency and duration of [the plaintiff's] sleep attacks and her need for daytime oxygen." Pl.'s Objs. at 8. The defendant responds that the ALJ "properly evaluated" the evidence regarding the plaintiff's alleged sleep attacks and oxygen use and that "[t]he evidence is consistent with the [ALJ's] [residual functional capacity] assessment for a range of sedentary work[][ ] that is performed primarily while seated." Def.'s Resp. at 4. The Court will address the plaintiff's alleged daytime oxygen use and sleep attacks in turn.

1.        **Daytime Oxygen Use**

The plaintiff argues that the "[t]he ALJ's failure to make any findings with regards to [her] need for supplemental daytime oxygen[] and failure to obtain any vocational evidence regarding that need for daytime oxygen requires remand." Pl.'s Mem. at 33–34. Additionally, the plaintiff challenges the Magistrate Judge's conclusion "that because the ALJ generally found [the plaintiff] to be less than fully credible, the ALJ must have concluded that she did not need daytime oxygen," arguing that "[t]his [conclusion] amounts to post hoc speculation [because] the ALJ never connected the dots between h[er] credibility finding generally[] and [the] [p]laintiff's specific need for daytime oxygen." Pl.'s Objs. at 10. The defendant responds that "[t]he ALJ properly discredited [the] [p]laintiff's allegation with respect to her need for oxygen" because she "thoroughly considered [the] [p]laintiff's use of oxygen and cited [Nurse] Worby's medical records, which contradicted [the] [p]laintiff's hearing testimony that she used oxygen every day, all day, for the past two years." Def.'s Resp. at 4 (internal citations omitted). The defendant further contends that records indicating that the plaintiff "continued to smoke and an October 2013 medical record show[ing] that [the plaintiff] could walk on flat surfaces without oxygen after she lost [weight] . . . corroborated the ALJ's decision that [the] [p]laintiff's use of oxygen did not show an inability to work for no less than [twelve] consecutive months." Id. (internal citations omitted).

Even assuming the plaintiff is correct that the ALJ erred by not expressly including in her residual functional capacity assessment any limitations related to the plaintiff's alleged daytime oxygen use, the Court must find that any such error was harmless. See Mitchell v. Berryhill, 241 F. Supp. 3d 161, 166 (D.D.C. 2017) ("When the Commissioner's decision evinces legal error, . . . the court should nonetheless affirm if the error was harmless."). As already explained,

it is the plaintiff's burden to prove at step four that her impairments prevent her from performing her past relevant work. See Butler, 353 F.3d at 997. Here, the plaintiff does not provide, and the record does not appear to reflect, any evidence demonstrating that the plaintiff's daytime oxygen use would prevent her from performing her past relevant work as a customer service representative or quality assurance agent. See AR 24. Notably, the plaintiff did not solicit any testimony from the impartial vocational expert establishing that her daytime oxygen use would limit her ability to perform the physical functions the ALJ identified as necessary for the plaintiff's past relevant work. See AR 59–60; see also AR 21 (identifying the functions the plaintiff must perform as "lifting up to [ten] pounds occasionally[;] standing or walking approximately two hours[;] sitting approximately six hours in an eight hour work day; [unlimited] pushing and pulling . . . except as shown for lifting and carrying; . . . frequently balancing, [and] occasionally climbing ramps and stairs, stooping, crouching, and kneeling"). Nor did she provide any other evidence demonstrating that her daytime oxygen use would prevent her from performing these functions. Indeed, the plaintiff's testimony before the ALJ suggests that her oxygen use imposed only minimal restrictions on her mobility. See AR 52 (testifying that she carries a portable oxygen tank that is "not very" heavy and weighs "maybe seven pounds"). Moreover, the plaintiff did not identify any other functions required by her past relevant work that her oxygen use would prevent her from performing, and it is not otherwise apparent to the Court that her oxygen use would prevent her from performing these functions. See AR 40 (testifying that her customer service representative position required her to "answer[] the phone, talk[] to the customers, sometimes . . . train[] other representatives" and "[t]rouble shoot[] the [ ] customer[s'] problems"); AR 41 (testifying that her quality assurance agent position required her to "listen[] to [customer service] representatives['] phone calls over a

device and grade[] their phone calls, ha[ve] conferences with the representatives about their scores, [and] . . . train[] them").

Thus, the plaintiff has not demonstrated that her daytime oxygen use prevents her from performing the requirements of her past relevant work, and accordingly, any failure by the ALJ to incorporate limitations regarding the plaintiff's daytime oxygen use into the plaintiff's residual functional capacity was harmless. See Barlow v. Comm'r of Soc. Sec., Civ. Action No. 17-756, 2018 WL 2410361, at *7–8 (S.D. Ohio May 29, 2018), report and recommendation adopted, Civ. Action No. 17- 756, 2018 WL 3008208 (S.D. Ohio June 15, 2018) (concluding that "even if the ALJ erred in failing to accurately capture all of [the] [p]laintiff's visual limitations . . . , any such error was harmless" because the plaintiff "fail[ed] to explain how his visual impairments prevent[ed] him from performing his past [relevant] work"); see also Gallegos v. Astrue, Civ. Action No. 12- 0038-RFC, 2013 WL 1290199, at *10 (W.D. Tex. Mar. 25, 2013) (concluding that "[t]o the extent the ALJ erred by not including the limitations he found to be caused by [the] [p]laintiff's mental impairment in his statement of [the] [p]laintiff's [residual functional capacity], such error [was] harmless" because the "[p]laintiff ha[d] not demonstrated that . . . a more detailed discussion of her depression or an explicit inclusion of accommodations supported by the ALJ's findings would exclude [the p]laintiff's past relevant work and shift the burden to the Commissioner at step five").

The plaintiff's counterarguments are unpersuasive. She relies on the Western District of Virginia's decision in Barnwell v. Colvin to support her position that the ALJ's failure to include in her residual functional capacity limitations regarding her daytime oxygen use is reversible error. See Pl.'s Mem. at 34 (citing Barnwell v. Colvin, Civ. Action No. 13-19, 2014 WL 3890442, at *17 (W.D. Va. 2014)). In that case, the court concluded that the ALJ's failure to

"include[] an accommodation for oxygen use in the [residual functional capacity] determination"
was reversible error "[b]ecause there [wa]s no evidentiary basis in th[e] record to support a
finding that a person requiring supplemental oxygen could perform the jobs" the ALJ found the
plaintiff could perform. Barnwell, 2014 WL 3890442, at *17. However, this reasoning
misstates the parties' burdens at step four. It is not the ALJ's burden at step four to demonstrate
that the plaintiff can perform her past relevant work despite her limitations; rather, it is the
plaintiff's burden to demonstrate that she cannot perform her past relevant work given her
limitations. As already explained, the plaintiff has not satisfied that burden here. Moreover, to
the extent that the plaintiff now seeks to introduce the testimony of vocational experts in other
cases cited by the court in Barnwell, see 2014 WL 3890442, at *17, the Court may not consider
evidence outside of the administrative record developed below, see Jones v. Soc. Sec. Admin.,
Civ. Action No. 16-2290 (CKK), 2018 WL 5817351, at *4 (D.D.C. Nov. 7, 2018) ("[T]he
Court's review is confined to the administrative record that was before the ALJ at the time of the
decision[.]"). In any event, as Barnwell recognizes, there exists "some disagreement among
vocational experts on the question." 2014 WL 3890442, at *17. Thus, Barnwell does not
support the plaintiff's position.

In the absence of any evidence demonstrating that the plaintiff's daytime oxygen use
prevents her from performing the functions required for her past relevant work, the Court cannot
conclude that the ALJ's incorporation of the plaintiff's daytime oxygen use into the plaintiff's
residual functional capacity would have changed the ALJ's conclusion at step four that the
plaintiff is able to perform her past relevant work. Thus, the Court must conclude that any error
committed by the ALJ with respect to the plaintiff's daytime oxygen use was harmless.

## 2.  Sleep Attacks

The plaintiff argues that the ALJ should have "made [ ] specific [residual functional capacity] findings or conclusions about" her sleep attacks, particularly, findings regarding the "frequency and duration" of the sleep attacks, Pl.'s Objs. at 8, as well as "what limitations would be imposed during a sleep attack," Pl.'s Resp. at 4; see Pl.'s Mem. at 33 ("[T]he ALJ's mere finding that [the plaintiff] did not suffer sleep attacks at the frequency and duration suggested by [Nurse] Worby was insufficient to enable meaningful review of her decision and requires remand."). She further argues that the Magistrate Judge's conclusion that "[t]he ALJ was not required to evaluate [the] [p]laintiff's sleep attacks because they were unsupported by objective evidence . . . is a[n] [impermissible] post hoc rationalization." Pl.'s Objs. at 8. The defendant responds that the ALJ adequately "discussed the evidence of [the] [p]laintiff's sleep apnea," including by "not[ing] the sparse complaints of sleep apnea, . . . that [the] [p]laintiff could 'sleep without difficulty' at an August 2013 session" with Nurse Worby, and that Nurse "Worby's opinion about the frequency of [the] [p]laintiff's 'sleep attacks' was inconsistent with the record." Def.'s Resp. at 3; see id. at 4 ("Despite Nurse Worby's opinion that [the] [p]laintiff had four to five 'sleep attacks' per day, the records did not support such severity." (internal citations omitted)).

The Court must agree with the plaintiff that the ALJ did not adequately address the plaintiff's allegations regarding her "sleep attacks" or her inability to stay awake. Although the ALJ addressed and assigned "very little weight" to Nurse Worby's opinion regarding the plaintiff's alleged sleep attacks, see AR 24, and the plaintiff does not directly challenge the ALJ's assessment of what weight to assign that opinion, see Pl.'s Objs. at 8 (only challenging the ALJ's reliance on the state agency consultants' opinions); Pl.'s Mem. at 19, 33 (acknowledging

the ALJ's decision to assign very little weight to Nurse Worby's opinion but not explicitly challenging it), the ALJ did not adequately address the plaintiff's remaining evidence of her sleep attacks, namely, the plaintiff's and Barnes's statements regarding the plaintiff's inability "to stay awake for extended periods of time," e.g., AR 199. With respect to the plaintiff's statements regarding her inability to stay awake, the ALJ did not explicitly address these statements, but instead only generally found that all of the plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms [we]re not entirely credible." AR 21. As already explained, the ALJ concluded that "[s]everal elements in the record call[ed] into question the credibility of the [plaintiff's] allegations," namely, that the plaintiff "testified that she applied for disability when she began using oxygen, because that is what everyone told her she was supposed to do," that the plaintiff "ha[d] not been compliant with her treatment," AR 21, and that "her activities of daily living [went] beyond limitations that preclude work," AR 22. Additionally, with respect to Barnes's statements "that the [plaintiff] is unable to concentrate for long periods of time, [that] she loses her train of thought, and [that] her ability to stay awake has been decreasing," AR 23, the ALJ dismissed these statements because "the [plaintiff's] activities [ ] of preparing complete meals, reading, writing, playing cards and computer games, and watching television all require the ability to maintain concentration for the duration of those activities," AR 24.

The Court cannot conclude that the evidence regarding the plaintiff's daily activities suffices to support the ALJ's decision to discredit the plaintiff's and Barnes's statements regarding the plaintiff's inability to stay awake. Although an ALJ may properly consider a claimant's "daily activities" when evaluating her statements regarding her symptoms, 20 C.F.R. § 404.1529(c)(3)(i), "ALJs must be especially cautious in concluding that daily activities are

inconsistent with testimony about [a claimant's symptoms], because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day," Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014); see Smolen v. Chater, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits[.]").  And, "[a] claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job."  Polidoro v. Apfel, No. 98 CIV. 2071 (RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999) (citation omitted); see Petty v. Colvin, 204 F. Supp. 3d 196, 207 (D.D.C. 2016) (explaining that an "ALJ should assess the 'individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [eight] hours a day, for [five] days a week, or an equivalent work schedule" (emphasis added)).  Moreover, the ALJ cannot "ignore[] the limited fashion [in which] the plaintiff engages in . . . [her] activities."  Jackson v. Barnhart, 271 F. Supp. 2d 30, 36 (D.D.C. 2002).

Here, the ALJ did not consider whether the plaintiff could perform any of her daily activities in a work setting for sustained periods of time without falling asleep, and the record does not appear to reflect that she could.  Rather, the plaintiff's testimony at her hearing was that she could watch television for only "[a]bout two[] [or] three" hours a day and play memory games on the computer for "[m]aybe an hour" per day, AR 54; see AR 55 (testifying that when on the computer, she "play[s] [memory] game[s]"), and, indeed, she testified that she would fall "asleep" while "looking at the [television]," AR 54, and that "some days [she] c[ould not] even play the [memory] games because [she could not] focus long enough to do what the game

actually want[ed] [her] to do," AR 44.  The plaintiff also represented in her Function Report that she "often t[ook] longer to complete tasks because [she was] tired and sleepy" and could only pay attention for "about [thirty] minutes" at a time.  AR 203.  Barnes confirmed many of these limitations, stating that the plaintiff "ha[d] trouble completing task[s] because she [would] fall[] asleep" and could pay attention for only "[thirty] min[ute]s [to] [one] hour."  AR 214.  The absence of any findings or evidence to support that the plaintiff engaged in her daily activities for sustained periods of time seriously undermines the ALJ's finding that the plaintiff's daily activities indicated a lack of credibility.  See Moe v. Berryhill, 731 F. App'x 588, 591–92 (9th Cir. 2018) (concluding that "[s]ubstantial evidence d[id] not support [an] ALJ's conclusion that [the claimant's] ability to complete some basic self-care activities was inconsistent with his testimony regarding symptoms from paranoia and flashbacks").

Additionally, "the ALJ ignored the limited fashion [in which] the plaintiff engages in some of the activities she described."  Jackson, 271 F. Supp. 2d at 36.  For example, although the plaintiff represented that she "[d]ress[ed] [her] minor child, d[id] household chores, [and] cook[ed]," she also represented that she "t[ook] frequent breaks between every task."  AR 199. And, although the plaintiff also represented that she prepared "[c]omplete meals," AR 200, she claimed that she only did so three to four times per week, see AR 200, and both the plaintiff and Barnes reported that it took the plaintiff several hours to complete a meal, see AR 200 (the plaintiff stating that it took her "at least 2–3 hours" to prepare meals); AR 211 (Barnes stating that it took the plaintiff "3–4 hours" to prepare meals).  Moreover, the plaintiff testified that she prepares only dinner, not breakfast or lunch, and that she "get[s] it started, [but] normally somebody else has to finish it."  AR 47.  And, although the plaintiff reported that she reads, she testified at her administrative hearing that she no longer engaged in that activity.  See AR 54–55.

Finally, although the plaintiff reported that she "[r]ead[,] watch[ed] [television], [and used the] computer" "daily," she also reported that she was "falling asleep during these activities." AR 202. The ALJ's apparent failure to consider this evidence of the plaintiff's limitations provides yet another reason to find that her decision to dismiss the plaintiff's and Barnes's statements is not supported by substantial evidence. See Jackson, 271 F. Supp. 2d at 37 (concluding that "[t]he ALJ's reliance on the [plaintiff's daily] activities" in discrediting the plaintiff's testimony "[wa]s misplaced" because "the ALJ's evaluation indicates that the ALJ did not consider all of the relevant evidence in the record" regarding the plaintiff's limitations).

The ALJ's remaining rationales for generally rejecting the plaintiff's statements regarding her symptoms also do not suffice to dismiss the plaintiff's allegations of her inability to stay awake for sustained periods. The ALJ's observation that "the claimant has not been compliant with her treatment" because she, inter alia, "does not continuously use . . . her CPAP machine daily as instructed," AR 21, does not justify the ALJ's credibility finding. Although an ALJ may find a plaintiff's

> statements . . . less credible if . . . medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure[,] [ ] the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96–7p, 1996 WL 374186, at *7; see 20 C.F.R. § 404.1530(c) (recognizing "[a]cceptable reasons for failure to follow prescribed treatment"). As the plaintiff correctly notes, see Pl.'s Mem. at 30, the record suggests that, in the period following the alleged onset date of the plaintiff's disability, the plaintiff failed to use her CPAP machine for a period of time because she was "[un]able to get [the] correct mask" for her machine. AR 607; see AR 599 (Nurse Worby reporting that, as of April 2013, the plaintiff "[h]a[d] been without CPAP mask [for]

several months, tried to reorder, never received, insurance changed, may need to order again with new insurance"). The ALJ's decision does not reflect that she considered this explanation. Consequently, the ALJ's inference that the plaintiff's statements about her symptoms were less credible because the plaintiff failed to use her CPAP machine was improper. See SSR 96–7p, 1996 WL 374186, at *7. Moreover, although the ALJ cited other instances of the plaintiff's noncompliance with her treatment, the ALJ did not connect these treatments to the plaintiff's sleep apnea, which the plaintiff alleged is the cause of her inability to stay awake, see AR 43 (testifying that her sleep apnea caused her "[c]onfusion, inability to concentrate, falling asleep if [she was] still for any length of time"), and the Court declines to speculate as to whether any such connection exists, see AR 21–22 (faulting the plaintiff for "continu[ing] to smoke cigarettes," which "exacerbated her pulmonary impairment," "turn[ing] off her oxygen to smoke," and having a "diet . . . high in sugary foods and drinks"). Thus, the plaintiff's noncompliance with her treatment also fails to support the ALJ's credibility finding as to the plaintiff's statements regarding her sleep apnea symptoms.

Finally, the Court cannot find that the plaintiff's "testi[mony] that she applied for disability when she began using oxygen, because that is what everyone told her she was supposed to do," AR 21, suffices to warrant dismissing her allegations regarding her inability to stay awake. The ALJ made no effort to explain the significance of this statement to her analysis. And, it is not apparent to the Court how the plaintiff's perception or misperception of when and under what circumstances it is appropriate to apply for disability benefits undermines her allegations regarding the specific symptoms she was experiencing. See Butler, 535 F.3d at 1005 ("The ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." (internal quotation marks omitted)). Moreover, in any event, rejecting a plaintiff's claim based on a single statement by her is inconsistent with the ALJ's responsibility to "consider the entire case record" when "determining the credibility of the [claimant's] statements." SSR 96–7p, 1996 WL 374186, at *1. Thus, the ALJ's reliance on the plaintiff's statement regarding why she applied for disability benefits is insufficient to support her conclusion.

The defendant's counterarguments on this matter are also not persuasive. Contrary to the defendant's position, the ALJ did not explicitly "note[] the sparse complaints of sleep apnea" in rejecting the plaintiff's and Barnes's statements regarding the plaintiff's sleep apnea symptoms. Def.'s Resp. at 3. Moreover, although the defendant is correct that the ALJ noted a progress note from Nurse Worby representing that "[the] [p]laintiff [told Nurse Worby that she] could 'sleep without difficulty' at an August 2013 session," id. (quoting AR 23, 618), the ALJ did so only in her initial summary of the available objective medical evidence, see AR 23, and did not offer this fact as a reason for her rejection of the plaintiff's and Barnes's statements regarding the plaintiff's sleep apnea symptoms. Thus, the defendant's arguments appear to be no more than "post hoc rationalizations" of the ALJ's decision, which "will not suffice." Clark v. Astrue, 826 F. Supp. 2d 13, 20 (D.D.C. 2011) (Walton, J.) ("[A] court may only consider the grounds proffered by the agency in its decision[.]").[5] Furthermore, the ALJ's finding that Nurse "Worby's opinion about the frequency of [the] [p]laintiff's 'sleep attacks' was inconsistent with the record," Def.'s Resp. at 3, does not demonstrate that the plaintiff did not experience any sleep

_____

[5] In any event, it would be difficult to find that evidence suggesting that the plaintiff's symptoms were controlled in one specific month could outweigh the plaintiff's and Barnes's statements regarding the persistence and severity of her symptoms.

attacks at all or any other sleep apnea symptoms.  Thus, the defendant's counterarguments do not persuade the Court that the ALJ adequately assessed the credibility of the plaintiff's and Barnes's statements regarding the plaintiff's sleep apnea symptoms.

Additionally, the Court cannot agree with the Magistrate Judge that "[t]he ALJ properly rejected [the] [p]laintiff's claim of daytime 'sleep attacks[]' because her claim is not based on objective medical findings."  R & R at 11.  First, the ALJ did not rely on the absence of objective medical evidence as the basis for rejecting the plaintiff's allegations regarding the plaintiff's sleep apnea symptoms, and, as already explained, the Court cannot rely on post hoc rationalizations not relied upon by the ALJ below.  See Clark, 826 F. Supp. 2d at 20.  Second, even if the ALJ had relied on this observation, it would not suffice to support her conclusion because it is well established that an "ALJ may not reject [a] claimant's statements solely because they are not substantiated by objective medical evidence; rather, [s]he 'must consider the entire case record.'"  Troy v. Colvin, 266 F. Supp. 3d 288, 296 (D.D.C. 2017) (quoting Barnhart, 353 F.3d at 1005); see SSR 96–7p, 1996 WL 374186, at *1 ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").  Therefore, the Magistrate Judge's reasoning does not persuade the Court to find that the ALJ properly rejected the plaintiff's evidence of sleep apnea symptoms either.

Thus, although "[t]he credibility determination is solely within the realm of the ALJ," Contreras v. Comm'r of Soc. Sec., 239 F. Supp. 3d 203, 210 (D.D.C. 2017) (quoting Grant v. Astrue, 857 F. Supp. 2d 146, 156 (D.D.C. 2012)), "[t]his does not[] [ ] give the ALJ unlimited discretion in making such a determination," id., and this Court must "intercede where an ALJ

fails to articulate a rational explanation for his or her finding," id. (quoting Grant, 857 F. Supp. 2d at 156). Here, for the reasons explained above, the ALJ failed to support her credibility findings with an adequate explanation and, thus, her credibility findings were error.

Having concluded that the ALJ erred by discrediting the plaintiff's and Barnes's statements regarding the plaintiff's sleep attacks and inability stay awake, the Court must consider whether the ALJ's error was harmless, see, e.g., Mitchell, 241 F. Supp. 3d at 166, which the Court finds it was not. Here, there exists evidence in the record that could support a finding that the plaintiff's alleged inability to stay awake would preclude her from performing her past relevant work. Specifically, the impartial vocational expert testified at the plaintiff's hearing that an "individual who is off task for [fifteen] to [eighteen] percent of [an eight-hour] workday . . . would not be able to maintain [any] position" in the national economy. AR 59. And, the plaintiff's and Barnes's statements that the plaintiff could not focus on a task for more than half an hour to an hour at a time and was often unable to stay awake, if credited by the ALJ upon remand, suggest that the plaintiff would be off task for more than the maximum allowable time of fifteen to eighteen percent—i.e., one hour and twelve minutes to one hour and twenty-six minutes—in an eight-hour workday. Thus, an ALJ could reasonably conclude based on this evidence that the plaintiff's sleep attacks and inability to stay awake precluded her from performing her past relevant work. See Moe, 731 F. App'x at 592 ("The ALJ's error in relying on several invalid reasons to discredit [the claimant's] testimony was not harmless because it was not inconsequential to the nondisability determination."); see also Porter v. Colvin, 951 F. Supp. 2d 125, 136–37 (D.D.C. 2013) ("The ALJ characterizes the medical record in a way that makes [the] [p]laintiff's statements appear inconsistent, leading to an adverse credibility finding that directly influences her [residual functional capacity]. Because the totality of the record casts her

complaints in a very different light—indeed, as supported by the medical record—it could very well lead to a different result, and prejudice does potentially lie.").

Moreover, the Court is unable to locate any evidence in the record demonstrating that the plaintiff could perform her past relevant work despite the evidence regarding her inability to stay awake. Notably, the state agency consultants' opinions did not explicitly address the plaintiff's alleged inability to stay awake. <u>See</u> AR 73–75 (assessing the plaintiff's exertional, postural, and environmental limitations but not reporting any mental limitations); AR 82–84 (same). Additionally, the plaintiff's daily activities do not adequately support the ALJ's conclusion that the plaintiff could perform her past relevant work, as "the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." <u>Brosnahan v. Barnhart</u>, 336 F.3d 671, 677 (8th Cir. 2003). This is especially so here, given that the ALJ "ignored the <u>limited</u> fashion [in which] the plaintiff engages in . . . [her] activities," <u>Jackson</u>, 271 F. Supp. 2d at 36, and also given that there exists little to no evidence that the plaintiff's activities are "easily transferable to a work environment where it might be impossible to rest periodically," <u>Smolen</u>, 80 F.3d at 1284 n.7 (9th Cir. 1996); <u>see</u> <u>Petty</u>, 204 F. Supp. 3d at 207 ("Many employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in [concentration, persistence, or] pace might be able to perform simple tasks, but not over an extended period of time." (alterations in original) (quoting <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 554 (3d Cir. 2004))). Finally, the plaintiff's failures to follow her treatment protocol also do not support the ALJ's conclusion because "[f]ailure to follow a prescribed treatment plan is a basis for denying a claimant benefits [only] when following the treatment plan would restore the claimant's ability to work." <u>Jackson</u>, 271 F. Supp. 2d at 38 (citing 20 C.F.R. § 404.1530); <u>see</u> 20 C.F.R.

§ 404.1530 ("In order to get benefits, you must follow treatment prescribed by your medical doctor(s) if th[e] treatment is expected to restore your ability to work." (emphasis added)). The ALJ did not make any findings regarding the extent to which the plaintiff's treatment would alleviate her sleep apnea symptoms, and she ignored evidence that the plaintiff was unable to obtain the correct mask for her CPAP machine, see AR 607, and the plaintiff's testimony that some of her treatment actually exacerbated her symptoms, see AR 45 (the plaintiff testifying that her diabetic neuropathy medicine "does[] [not] help the sleepiness because it makes [her] even more sleepy"). Thus, the Court cannot conclude that other evidence in the record clearly demonstrates that the plaintiff could perform her past relevant work notwithstanding her sleep apnea symptoms, such that the ALJ's error in discrediting the plaintiff's and Barnes's statements regarding those symptoms was harmless. See Payne v. Barnhart, 725 F. Supp. 2d 113, 119 (D.D.C. 2010) (reversing the ALJ's decision because the ALJ "fail[ed] to address [the plaintiff's] inability to concentrate and maintain attention for extended periods" and "the [c]ourt s[aw] nothing in the record to support the ALJ's determination that, given [the plaintiff's] inability to concentrate, he would be mentally capable of performing the duties of [his past relevant work as] a security guard"); cf. Barlow, 2018 WL 2410361, at *7–8 (concluding that the ALJ's "fail[ure] to accurately capture all of [the] [p]laintiff's visual limitations . . . was harmless" because the plaintiff "performed all of his past employment notwithstanding those limitations," and thus, "the record ma[de] clear that [he] could perform his past jobs with his vision impairments"); Davis, 272 F. Supp. 3d at 172 (concluding that an ALJ's "fail[ure] to include . . . [the] [p]laintiff's mild limitation in concentration, persistence, or pace" in her residual functional capacity was harmless because "the ALJ identified substantial medical and other evidence of record—including [the plaintiff's] completion of cosmetology school and high school and the opinions of . . . [three

physicians]—establishing that [the] [p]laintiff [wa]s capable of performing 'simple, routine, and repetitive tasks'").

In sum, the Court concludes that the ALJ erred by failing to provide adequate reasons for her decision to discred the plaintiff's and Barnes's statements regarding the plaintiff's sleep apnea symptoms. Additionally, the Court concludes that the ALJ's error was not harmless. Accordingly, the Court must remand this case to the ALJ for reconsideration of the plaintiff's and Barnes's statements regarding the plaintiff's sleep apnea symptoms.

**C.     The ALJ's Reliance on the State Agency Consultants' Opinions**

The plaintiff's final argument is that the ALJ's reliance on the state agency consultants' opinions constituted error for three reasons: (1) the opinions were rendered by "non-examining" physicians and "not based on a description of [the] [p]laintiff's limitations by any examining physician," Pl.'s Objs. at 8; (2) the opinions were "stale" because the consultants "had only a small fraction of [the plaintiff's pre-June 2012] records to [ ] review," id. at 4; and (3) "the ALJ's boilerplate statement that the [ ] opinions were consistent with the record[]" is "insufficient for purposes of judicial review," id. at 6, given that the opinions were "inconsistent with the only other [medical] opinion of record," i.e., Nurse Worby's opinion, id. at 8. The defendant responds that "[t]he ALJ's reliance on the opinion of state [agency] medical consultants was proper" and that "[t]he ALJ thoroughly reviewed and discussed the relevant evidence, including evidence that was submitted after the state agency medical opinions." Def.'s Resp. at 2.

First, the Court must reject the plaintiff's position that the ALJ's reliance on the state agency consultants' opinions was improper because the opinions were rendered by non-examining physicians or because the consultants "w[ere] not provided a description of [the] [claimant's] limitations by examining physicians." Pl.'s Objs. at 6. The plaintiff cites no

authority as support for the proposition that an ALJ may not rely on the opinion of a non-examining physician, and the regulations expressly contemplate the ALJ's reliance on opinions provided by nonexamining state agency medical consultants.  See 20 C.F.R. § 404.1513(c) (contemplating that an ALJ may consult residual functional capacity assessments "made by . . . State agency medical . . . consultants . . . based on their review of the evidence in the case record"); id. § 1527(c)(3) (providing instructions for the evaluation of opinions from "nonexamining sources").  Moreover, the plaintiff also fails to cite any authority for the position that a non-examining physician must receive a description of the plaintiff's limitations from examining physicians.  The case cited by the plaintiff as support for her position, Grant v. Astrue, see Pl.'s Objs. at 6, only acknowledges the Fourth Circuit's conclusion in Smith v. Schweiker that "the medical opinions of non-examining physicians who were not provided a description of a claimant's limitations by an examining medical source, and whose opinions are contradicted by all of the other evidence in the record, could not be given substantial weight," Grant, 857 F. Supp. 2d at 155 (emphasis added) (citing Smith v. Schweiker, 795 F.2d 343, 348 (4th Cir. 1986)).  The plaintiff does not claim that the state agency consultants' opinions were "contradicted by all of the other evidence in the record," id., but only that they were contradicted by Nurse Worby's opinion, see Pl.'s Objs. at 8.  Moreover, in Smith, the Fourth Circuit based its conclusion on the specific circumstances of that case, including the fact that "an opinion or diagnosis as to [the] impairment [at issue] . . . [wa]s not readily made without the physician personally examining or observing the patient," Smith, 795 F.2d at 346.  Here, the plaintiff has made no effort to demonstrate why the state agency consultants could not properly assess her specific impairments without examining her.  In any event, the state agency consultants received at least some progress notes from Nurse Worby, see, e.g., AR 71, who examined the plaintiff,

and thus, these consultants were to some extent "provided a description of [the] claimant's limitations by an examining medical source," Grant, 857 F. Supp. 2d at 155.  Thus, the Court must reject the plaintiff's argument that the state agency consultants' opinions were invalid simply because the consultants did not examine the plaintiff or review all of Nurse Worby's records.

Second, the Court must reject the plaintiff's position that the ALJ's reliance on the state agency consultants' opinions was improper because the opinions were "stale."  Although the plaintiff appears to correctly represent that the state agency consultants did not consider the post-June 2012 evidence, see AR 71–72 (indicating that Dr. Nicholas considered only Nurse Worby's treatment records received by the SSA prior to August 14, 2012); AR 79–80 (indicating that Dr. McMorris considered only Nurse Worby's treatment records received by the SSA prior to August 14, 2012, and Washington Hospital Center records received on August 21, 2012, and December 7, 2012); AR 578–650 (Nurse Worby's progress notes dated June 4, 2012, to April 17, 2014), "[n]ew medical evidence introduced into the record after a [s]tate agency consultant's assessment does not automatically render that assessment invalid," Goodman v. Colvin, 233 F. Supp. 3d 88, 105 (D.D.C. 2017).

However, the Court must agree with the plaintiff that the ALJ did not adequately explain her reliance on the state agency consultants' opinions given the existence of evidence in the record contradicting those opinions, including post-June 2012 evidence.  As already explained, the ALJ gave "great weight" to the state agency consultants' opinions because they were "consistent" with record evidence reflecting the plaintiff's "level of functioning" and "with the evidence at the hearing level."  AR 23.  However, the consultants' conclusions that the plaintiff could sit with normal breaks for a total of six hours in an eight-hour workday, see, e.g., AR 74,

are inconsistent with the plaintiff's and Barnes's statements that the plaintiff was "unable to stay awake for long periods of time," AR 199, as well as information contained in the post-June 2012 evidence supporting those statements, see, e.g., AR 607 (noting that the plaintiff reported "nodding off during conversations").   Because the ALJ improperly rejected the plaintiff's and Barnes's statements and did not explicitly address other evidence in the record that is inconsistent with the state agency consultants' opinions, the Court must conclude that the ALJ inadequately explained her reliance on the state agency consultants' opinions.  See Charles v. Astrue, 854 F. Supp. 2d 22, 29 (D.D.C. 2012) (Walton, J.) ("The adjudicator must [ ] explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

Moreover, the Court cannot find that the ALJ's failure to adequately explain her reliance on the state agency consultants' opinions constitutes harmless error, as the error frustrates the ability of the Court to conduct meaningful review and determine whether the ALJ's decision is supported by substantial evidence." Carroll v. Berryhill, Civ. Action No. 16 -218, 2018 WL 1913587, at *3 (W.D.N.C. Apr. 23, 2018) (concluding that an "ALJ's failure to provide a sufficient explanation [wa]s not harmless error"); see Turner, 710 F. Supp. 2d at 105 ("A reviewing court should not be left guessing as to how the ALJ evaluated probative material, and it is reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence.").  Thus, the ALJ's failure to adequately explain her reliance on the state agency consultants' opinions represents an additional reason for the Court to reverse the ALJ's decision in this case.

# IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ committed reversible error by discrediting the plaintiff's and Barnes's statements regarding the plaintiff's inability to stay awake and by failing to adequately address and resolve inconsistencies between the state agency consultants' opinions and other evidence in the record.  However, the Court rejects the plaintiff's remaining challenges to the ALJ's decision.  Thus, the Court concludes that it must grant in part and deny in part the plaintiff's motion for a judgment of reversal, deny the defendant's motion for judgment of affirmance, and remand this case to the Commissioner for further proceedings consistent with this Memorandum Opinion.[6]

**SO ORDERED** this 16th day of September, 2019.

REGGIE B. WALTON
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.